Filed 9/11/20  P. v. Jackson CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

| California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. |
|---|

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON JACKSON,<br><br>    Defendant and Appellant. | D074547<br><br><br><br>(Super. Ct. No. JCF36468) |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Aaron Jackson participated in a home invasion robbery, along with Justin Alford and Kevin Scott, that resulted in the death of Donald Tarker.

A jury found Jackson guilty of murder (count 1, Pen. Code,[1] § 187, subd. (a)); home invasion robbery (count 2, § 211); first degree burglary with a person present (count 3, § 459); battery with serious bodily injury (count 6, § 243, subd. (d)); and conspiracy to commit a crime (count 7, § 182, subd. (a)(1)). The jury also found that the murder was committed while Jackson was engaged as a major participant in a conspiracy to commit robbery and burglary, as alleged in special circumstances to the murder charge. (§ 190.2, subd. (a)(17).)

Thereafter, the superior court struck the special circumstance allegation—after finding that a life without the possibility of parole (LWOP) sentence would constitute cruel and unusual punishment—and sentenced Jackson to an indeterminate term of 25 years to life, plus a consecutive determinate term of three years.

Jackson appeals and asserts that there was insufficient evidence to support the true findings on the special circumstance allegations, that the trial court erred by failing to instruct the jury as to a lesser-included offense of simple battery on count 6, and that the abstract of judgment must be amended to reflect the oral pronouncement of judgment as to count 2. The People concede that the abstract should be amended, and we agree, but we are not persuaded by Jackson's remaining arguments. We therefore instruct the trial court to amend the abstract of judgment and affirm the judgment in all other respects.

---

[1] All further statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*May 25, 2016 Home Invasion*

Tarker, the primary victim, operated a marijuana dispensary out of his home in Salton City. Jackson and Alford knew about the dispensary and, in May 2016, they decided to rob Tarker and steal the marijuana.

On May 20, Alford messaged Jackson and said, "I went to ol' boy house this morning. I went right past it, too. . . . And we need to go ASAP. . . . It's waiting for us." However, Tarker's house was approximately an hour away, so they needed a ride. They asked Scott and he agreed to drive them to Tarker's. Alford asked Scott to call Tarker's phone and, on May 24, Scott texted Alford and said Tarker did not answer. He then said, "I'll keep calling them. We ain't paying for shit."

The next day, May 25, Tarker arrived home from the hospital after undergoing brain surgery related to head injuries he sustained in a separate home invasion that occurred approximately 30 days earlier. That evening, Tarker had a number of friends over, including Andrew R., Angela W., and Angela's 16-year-old daughter Destiny. Tarker was acting normal, talking with his friends, and walking around the house.

At approximately 7:00 p.m., Scott picked up Jackson and Alford and drove to Tarker's. Jackson was wearing a white T-shirt and black pants, and Alford was wearing gray jogging pants, gray shoes, and a "whitish grayish" shirt.[2]

They arrived and knocked on the front door of Tarker's house sometime between 8:00 p.m. and 9:00 p.m. Tarker opened the door to speak with them

---

[2] Later, in the car, Scott noticed blood on Alford's shirt and handed him a blue sweater to put on.

but left the screen door closed and locked. He then went into the kitchen and returned a couple of minutes later. Tarker unlocked the screen door and one or more of the assailants charged in, causing him to yell, "no," and fall backwards onto the ground.

Destiny saw two young African-American men, whom she later identified as Jackson and Alford, enter the living room. They were both wearing blue latex "doctor gloves." Alford hit Angela and Jackson hit Destiny, knocking her out.

Andrew was hit on the left side of his eye but was not sure what hit him. He had been drinking and smoking marijuana and did not recall much from the evening. Angela heard Andrew get hit but did not see who hit him. She heard Alford yelling and assumed it was him who hit Andrew, but she was not sure.

Alford asked Angela where the "stuff" was and threatened her, asking "Was this worth dying over?" Alford continued to hit Angela, approximately 50 to 75 times, and she eventually pretended to be unconscious so he would stop. She felt one of the men feel around her pants pockets for her phone and heard them find her and Destiny's purses.

Destiny eventually regained partial consciousness; she could hear the men yelling but she could not move or see. She heard the front door shut and then came back into full consciousness. Angela was bleeding, Andrew was unconscious, and her and Angela's phones and purses were missing.

After leaving the house, Jackson and Scott went to put the bags of marijuana in the trunk of Scott's car. In their rush to open the trunk, Jackson ripped the license plate holder off. According to Scott, Alford was the last to leave the house.

Angela waited a few minutes to ensure the men were gone and then crawled to the kitchen, found the house phone, and called 911. She told the operator that two people had come into the house and attacked them and that the individual who hit her was wearing a white T-shirt and black pants.

Around the same time, Imperial County Sheriff's Deputy E. Ramirez was driving down Highway 86 towards Salton City. He noticed a white car traveling northbound on the service road. The car drew his attention because the license plate cover was missing, causing the license plate lamps to be unusually bright.

Approximately nine minutes later, at 9:09 p.m., Ramirez received a dispatch call regarding the incident. Ramirez was near Tarker's house at that point and arrived on the scene just a few minutes later. He could see Angela in the kitchen, through a window, and noted that her face and hair were covered in blood. He entered through the front door and found a tall White adult male, later identified as Tarker, lying on the ground with his feet toward the door, unresponsive. Tarker was not breathing and Ramirez was not able to get a pulse. Another officer cleared the residence while Ramirez began CPR.

Emergency Medical Technicians (EMT's) arrived approximately 10 minutes later and took over treatment of Tarker. The medics were unable to revive Tarker and he was pronounced dead at the scene just before 10:00 p.m. A deputy coroner examined the body at approximately 11:30 p.m. Tarker had small lacerations and blunt force trauma injuries in several places on his body, including his head and back. In particular, there were "fresh" injuries to Tarker's right eye, right temple, left temple, and back consistent with blunt force trauma. A forensic pathologist later confirmed that Tarker died from blunt force trauma inflicted within one hour of his death but could not

5

determine whether there was one definitive injury, or blow, that caused his death.

Angela and Andrew were transported to the hospital via ambulance. Andrew had a one-inch long gash near his left eye and received eight to 10 stitches. Angela's nose was crushed, and her jaw was broken in three places. She was transported to a larger hospital for surgery and remained hospitalized for about a week. Destiny did not go to the hospital that evening, but she did experience chronic headaches for approximately two months after the assault.

*The Arrest and Investigation*

After the EMT's arrived, Ramirez put out a BOLO (be on the lookout) for the white car with the missing license plate cover that he had seen in the area just before receiving the dispatch call. The BOLO also identified three Black males as potential occupants, based on the descriptions given by the victims at the scene.

Meanwhile, Jackson, Alford, and Scott stopped at Brian's house to drop something off. While they were parked outside, Alford went through the purses and then threw them in a trashcan across the street. After leaving Brian's, they proceeded back toward Highway 86.

At 9:30 p.m., approximately 15 minutes after the BOLO went out, Agent Ascencio with the U.S. Border Patrol identified the vehicle traveling down Highway 86, in the opposite direction as Tarker's residence. Ascencio notified dispatch and stopped the vehicle. As he approached, he noticed a strong odor of marijuana emanating from the vehicle. Ascencio confirmed that there were three Black males in the vehicle and then returned to his vehicle to request backup.

When additional officers arrived, they secured the area and placed Scott, Jackson, and Alford in separate police vehicles. Agent Ascencio then conducted a search of the vehicle and located several bags containing what appeared to be marijuana plants, a bag full of clothing with bloodstains, and a number of other items. In addition, officers discovered a camcorder and tripod that belonged to Tarker in the trunk and a baseball bat in the backseat of the car.

After learning the border patrol had stopped a vehicle matching the description he gave, Ramirez drove to the location of the stop and confirmed that the car was the same car he had seen earlier that evening. Scott was subsequently identified as the driver, and Jackson and Alford were identified as the two passengers.

Sergeant Masad, the lead investigator on the matter, was at Tarker's residence when he learned the car had been located. Shortly after receiving the call, he left the residence and took Destiny to the location of the traffic stop to see if she could identify the suspects. It was nearly 11:00 p.m. by the time they arrived and there was minimal lighting available. Destiny remained in the back of Masad's vehicle, and a deputy walked each of the suspects to the front the vehicle, one at a time. Destiny could not identify any of the suspects. She was certain that she had not seen Scott at Tarker's but was not certain as to Jackson or Alford.

Jackson, Alford, and Scott were processed for evidence and interviewed. There was blood on Jackson's white T-shirt, on a dark-blue long-sleeved shirt worn by Alford, and on Alford's socks and shoes. The clothing was collected, and subsequent DNA testing indicated that Andrew was a primary contributor to the DNA in the blood.

Alford had a number of small cuts on his knuckles, consistent with the type of injuries typically sustained during an assault or fistfight. They were no longer bleeding but appeared to be "fresh" as they were still reddish and not dark. Alford had two stacks of five-dollar bills and a bag of marijuana in his pockets. When asked if the money and marijuana belonged to him, he said that one stack of money was his, but admitted he took the other stack and the marijuana from Tarker's residence.[3]

Alford initially said that he was not at Tarker's and did not know anything about the home invasion. He said he got into a fight at his friend Brian's house, which was nearby in Salton City, and the blood on his clothing was his own. He said Scott picked him up after the fight and the police pulled them over shortly thereafter.

He then changed his story and admitted he had gone to Tarker's. He said his friend Brian told him there was marijuana in the bedrooms and assured him that no one would be home. He met Brian, Scott, and Jackson at a convenience store earlier that evening, discussed the plans, and then he, Scott, and Jackson went to Tarker. He said they had not actually gone to Brian's house and the blood on his pants was from a fight with a "cholo" before they left Indio. Alford claimed he was the last one to enter Tarker's house, went straight to the bedroom to put the marijuana in the bags, and did not touch any of the victims.

Jackson initially said that he was not involved in the plan, did not enter the house, and was just a lookout. He later admitted they had planned to steal the marijuana and said Tarker fell when they rushed through the

---

[3]     The court instructed the jury to consider Alford's statements only in deciding Alford's case, and not to consider them as to Jackson.

door.  He said Tarker was conscious after the fall and was trying to poke him with a metal object, but that he saw Tarker on the ground when they were leaving and thought he looked dead.  Jackson also admitted that he went into the house and helped fill a duffle bag with marijuana.  He said he changed his shirt in the car and threw the one he was wearing during the robbery out the window on the freeway.

Scott admitted that he was the driver and that he stole marijuana from Tarker's home but claimed that his involvement was "minor."

Masad interviewed Angela five days later, on May 31.  He showed her three sets of six photographs (six-packs), each of which included a photograph of Jackson, Alford, and Scott.  Angela did not identify Scott but she did identify Jackson and Alford as the two men that she saw during the home invasion and further identified Alford as the individual who assaulted her.

A deputy sheriff went to look in the trashcan near Brian's house for the purses but when he arrived, the trashcans in the area were empty.  A neighbor told him the trash had been picked up earlier that morning, so he went to the city landfill and eventually located the purse in the trash that had been dropped off that day.

*Scott Agrees to Testify Against Jackson and Alford*

In January 2018, Scott entered a plea agreement and agreed to testify against Jackson and Alford in exchange for a more lenient sentence.

In a follow-up interview with Masad, he said that Alford texted him and asked him to call Tarker to see if he was home.  He drove Jackson and Alford to Tarker's house and, when they got there, Alford told him to knock on the door and ask for some "weed."  Tarker said, "let me check" and went into the house, closing the screen door but leaving the main door open.  Tarker returned with a green bottle.  He opened the door and Jackson and

9

Alford rushed in. Alford told Tarker to lay down on the floor and asked him "where's the weed?"

Scott heard Alford and Jackson "tussling" with Tarker and Alford later told him that Tarker was trying to hit him with some sort of metal object. Scott indicated that both Alford and Jackson were fighting with Tarker, and that he saw Jackson punch Tarker and take the metal object away from him. It then became quiet and Alford ran toward him and handed him some gloves. He then helped pack a number of marijuana plants into bags. Scott and Jackson took the bags to the car and Alford stayed behind. Scott heard yelling and screaming and then Alford emerged with a bag and two purses.

Scott testified consistently with this account at trial. Specifically, Scott testified that Jackson wrestled the metal object away from Tarker and hit Tarker with his fist at least a couple of times. He said Alford also hit Tarker several times after Jackson removed the metal object and Tarker stopped moving shortly thereafter.

*Defense Case*

Dr. Mitchell Eisen, an expert in eyewitness identification, testified regarding eyewitness identifications. He opined a witness who recalled seeing two assailants and did not identify one of the assailants in the first of three photo arrays would be more likely to "pick" someone in the second and third arrays. He further explained that sometimes an identification is made based on suggestive elements in the photograph, as opposed to actual recognition.

Jackson testified on his own behalf at trial. Jackson testified that he was 20 years old at the time of the murder, that this was his first arrest, and that he had had not previously been convicted of any crimes. He met Scott

approximately six months before Tarker's murder and they both worked as security guards at a local grocery store.

He said that he went to Tarker's with Scott and Alford on May 25 but thought they were going to buy marijuana, not to commit any crimes. He said it was Scott who initially charged into the house when Tarker brought the marijuana out and opened the door. The door hit Tarker in the head, causing him to fall straight back and hit the back of his head on the ground. Alford handed Jackson a black bag and either he or Scott directed Jackson to go to the bedroom and fill the bag with marijuana. Jackson testified that he never entered the living room and did not assault anyone. When they had all gotten into the car to leave, Scott said he forgot his phone and went back into the house alone.

Jackson's hands were photographed on the evening of the murder and he did not have any injuries, cuts, or abrasions on his knuckles or anywhere else. He asserted that was because he did not touch anyone that evening.

A.G. testified that he previously shared a cell with G.V., and that Scott bragged to him and G.V. about killing Tarker. He said Scott told them he went back to the house a second time and "went too far." Specifically, A.G. testified that Scott said, "I feel sorry for what I did. And I went over [*sic*] my hands, and I killed the guy. And I should have never went there the second time. I put him away." In addition, Scott told A.G. and G.V. that he was going to point to someone else to "get out of it."

At the time of trial, A.G. was housed in the same module as Jackson. A.G. talked and played cards with Jackson but said that he was testifying voluntarily and not to benefit Jackson.

*Sentencing*

The jury found Jackson guilty on all counts and found the special allegations to be true. The superior court struck the special circumstance murder allegations as to Jackson on count 1, in part based on a finding that an LWOP sentence would constitute cruel and unusual punishment under the circumstances. The court then sentenced Jackson to prison for a total term of 25 years to life, plus a consecutive three years on count 6.

DISCUSSION

I.

*Sufficient Evidence Supports the Felony Murder Special
Circumstance Findings*

Jackson asserts there was insufficient evidence to support the jury's true finding on the special circumstance.

A. *Relevant Legal Principles*

Section 190.2 enumerates felony-murder special circumstances requiring a sentence of either death or life without the possibility of parole. Of relevance here, robbery and burglary are included in the felonies enumerated in paragraph (17) of subdivision (a). (§ 190.2, subds. (a)(17)(A) & (a)(17)(G).)

Section 190.2, subdivision (c), states, "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true . . . ."

In addition, section 190.2, subdivision (d) further provides "Notwithstanding subdivision (c), every person, not the actual killer, who,

12

with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true . . . ."

Accordingly, a felony murder falls under the special circumstance statute if the defendant is not the actual killer but is a major participant who, with either the intent to kill or a reckless indifference to human life, aids, abets, or assists in the commission of a robbery or a burglary. (§ 190.2, subds. (a)(17)(A), (a)(17)(g), (c), (d); *People v. Estrada* (1995) 11 Cal.4th 568, 572 (*Estrada*).)

B. *Analysis*

Here, the verdict form for count 1 (felony murder) for Jackson contained the following special allegations: (1) "that the murder was committed while the defendant was engaged in, or a member of a conspiracy to commit, Robbery in violation of . . . Sections 211 or 212.5 and was the killer or was a major participant as alleged in the Special Circumstance"; and (2) "that the murder was committed while the defendant was engaged in, or a member of a conspiracy to commit, Residential Burglary in violation of . . . Section 460, and was the killer or was a major participant as alleged in the Special Circumstance." In connection with the foregoing allegations, the superior court instructed the jury, "[i]f you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find this special circumstance true, you must

13

find that the defendant acted with intent to kill or you must find that the defendant acted with reckless indifference to human life and was a *major participant* in the crime." The jury found both allegations true.

Jackson asserts those findings should be reversed because they were not supported by sufficient evidence. Specifically, he concedes there was sufficient evidence to support the guilty verdicts for counts 1 through 3—felony murder, robbery and burglary—but asserts the prosecution did not allege he was the actual killer and did not present sufficient evidence to establish he was a major participant who acted with either an intent to kill or a reckless indifference to human life.

1. *The Superior Court Struck the Special Circumstance Finding and Jackson Suffered no Prejudice as a Result*

As an initial matter, Jackson suffered no prejudice as a result of the special circumstance finding. The superior court struck the special circumstance allegations as to Jackson and sentenced him to the standard term, absent a section 190.2 special circumstance finding, of 25 years to life on count 1. Accordingly, "there was no 'error that worked against [him]'" and no prejudice requiring reversal. (See *People v. Avila* (2006) 38 Cal.4th 491, 600; cf. *People v. Banks* (2015) 61 Cal.4th 788, 794, 804-812 [special circumstance reversed for insufficient evidence where defendant was actually sentenced to LWOP]; cf. *People v. Clark* (2016) 63 Cal.4th 522, 624 (*Clark*) [decision vacating special-circumstance findings does not require reversal of death penalty where additional special circumstance findings were not vacated].)

14

## 2. *Substantial Evidence Supports the Special Circumstance Finding*

Regardless, and in an abundance of caution, we address the merits of Jackson's argument and conclude there was sufficient evidence to support the special circumstance findings.

We review a challenge to the sufficiency of the evidence to support a special circumstance finding in the same manner as a challenge to the sufficiency of the evidence supporting a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229; *People v. Mayfield* (1997) 14 Cal.4th 668, 790-791.) We independently review the record as a whole in the light most favorable to the judgment and determine whether substantial evidence supports the finding. (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*); *People v. Story* (2009) 45 Cal.4th 1282, 1296 (*Story*).) Substantial evidence is evidence that is reasonable, credible, and of solid value, which would allow a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. (*Banks*, at p. 804; *Story*, at p. 1296.) The existence of evidence that might also reasonably support a finding to the contrary, without more, is not sufficient to warrant a reversal. (*Story*, at p. 1296.)

### a. *Evidence Jackson was a Major Participant*

We consider the following factors when determining whether a defendant was a "major participant":

> "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?" (*Banks*, *supra*, 61 Cal.4th at p. 803.)

15

Here, there was substantial evidence that Jackson was at least somewhat involved in the planning of the crime, was present at the scene of the crime, was in a position to facilitate or prevent Tarker's murder, and his actions or inaction played a role in Tarker's death. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Specifically, Jackson and Alford texted about going to Tarker's house on May 20, five days before the murder, and Jackson later admitted that they planned to steal Tarker's marijuana. Further, there was evidence at trial indicating Jackson entered the house with the other assailants, even after learning the house was occupied, assaulted at least one of the individuals in the home, and took the metal object that Tarker was using to defend himself. Finally, there was evidence that Jackson carried out the plan to steal the marijuana, after witnessing and participating in the assaults, and fled the scene without rendering any aid to Tarker or the other victims.

Addressing the factors set forth in *Banks*, Jackson argues he did not have a role in planning the robbery and that Scott and Alford had originally planned to go without him a couple of days earlier. Although Scott did testify that he agreed to take Alford to Salton City on May 23, there was no indication that they were planning to go without Jackson. Instead, the text message between Alford and Jackson indicates Jackson was involved as early as May 20.

Next, Alford asserts there were no weapons used and he did not have awareness of the dangers posed by the nature of the crime or past experience or conduct of the other participants. To the contrary, a home invasion is an inherently dangerous crime and, while it does appear that fists were the only weapons used, there was ample evidence Jackson played a role in using them. Specifically, there was evidence Jackson entered the house knowing there were multiple individuals present, carried through with the plan to

16

steal the marijuana after witnessing and participating in the violent assault of all four occupants, and made no effort to render aid to Tarker. (See *People v. Mora* (1995) 39 Cal.App.4th 607, 617; *Tison v. Arizona* (1987) 481 U.S. 137, 152 [the defendant "participated fully in the kidnapping and robbery and watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims"]; cf. *Banks*, *supra*, 61 Cal.4th at p. 805 [defendant who has acted solely as a getaway driver and was absent from the scene when the murder occurred was not a major participant].)

Finally, Jackson argues there was no obvious fatal blow, no one expected Tarker to die from his injuries, and the fact that he failed to render aid was mitigated by the fact that there were several other people in the house. To the contrary, Jackson witnessed the assault on Tarker and testified, himself, that Tarker was unconscious when he left. Moreover, there was substantial evidence the other three victims were also unconscious, or at least pretending to be unconscious, when Jackson and the others left the scene, and all of them were inside the residence, where they were not likely to be seen by a passerby. Thus, as far as Jackson knew, Tarker was unconscious and there was no one available to call for help or render aid. It was therefore reasonable for the jury to infer that Jackson was at least aware of the risk that Tarker might die from his injuries after he fled the scene.

b. *Evidence of Reckless Indifference*

The phrase "reckless indifference to human life" does not have any special meaning under the law, and simply requires that the defendant be subjectively aware that the criminal activity that they are participating in involves a grave risk of death. (*People v. Mil* (2012) 53 Cal.4th 400, 417; *Estrada*, *supra*, 11 Cal.4th at p. 577.)

17

Jackson relies primarily on *Clark*, *supra*, 63 Cal.4th 522 to assert there was insufficient evidence he acted with reckless indifference. There, the California Supreme Court considered "the specific facts of Clark's case in light of some of the case-specific factors that this court and other state appellate courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Id*. at p. 618.) The court ultimately determined there was insufficient evidence Clark acted with reckless indifference to human life. (See *id*. at p. 623.) However, as the court in *Clark* explained, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id*. at p. 618) In any event, we are not persuaded by Jackson's analysis of the *Clark* factors.

First, Jackson argues neither he nor either of his coassailants brought or used any weapons. (See *Clark*, *supra*, 63 Cal.4th at p. 618.) Although this may be a significant factor in some cases, here the assailants used their fists to render several victims unconscious, killing one, and seriously wounding another. Jackson was admittedly inside the house when the beatings occurred and there was evidence he assisted in removing the metal object Tarker was using to defend himself, substantially increasing the risk of substantial injury or death. Citing the fifth factor addressed in *Clark*—the "defendant's efforts to minimize the risks of the violence during the felony"— Jackson argues that taking the metal rod and punching Tarker in the chest somehow prevented a further escalation of violence. We disagree.

Next, Jackson argues Tarker's death was not a culmination or a foreseeable result of several intermediate steps or a situation where the killer exhibited behavior suggesting a willingness to use lethal forces. (See *Clark*, *supra*, 63 Cal.4th at p. 619.) To the contrary, as discussed *ante*, there was

18

evidence Jackson was present when all four individuals in the house were beaten to the point of unconsciousness and personally assisted in rendering Tarker defenseless. In a related argument, Jackson again asserts his failure to render aid was minimized by the fact that there were three other individuals in the home but, as discussed *ante*, the other individuals either were or appeared to be unconscious when Jackson left the scene.

Next, Jackson argues the duration of the felony was relatively short, approximately 10 to 15 minutes, and thus was insufficient to exhibit an indifference to human life. (See *Clark, supra,* 63 Cal.4th at p. 620.) While there was evidence suggesting the assailants believed no one would be home, once the assailants realized there were several individuals at the house, they continued with the plan and subdued the victims by using physical force sufficient to render them unconscious. By contrast, in *Clark*, the assailants planned to subdue the store employees by handcuffing them in the bathroom and the murder occurred only when an employee's mother entered the store and took them by surprise. (*Id.* at p. 539.) Thus, contrary to Jackson's assertion, the duration of the use of inherently dangerous physical force in connection with the felony was more significant here.

Finally, Jackson asserts there was no evidence Alford or Scott had a prior history of murder or propensity to violence. (See *Clark, supra,* 63 Cal.4th at p. 621; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405.) On this point, we agree. However, this one factor, alone, is not sufficient to overcome the remaining evidence indicating Jackson did act with a reckless disregard to human life. (See *Clark*, at p. 623.)

19

We therefore conclude substantial evidence supports the jury's felony murder special circumstance findings.[4]

## II.

*The Superior Court Did Not Err By Failing to Instruct the Jury on the Lesser Included Offense of Simple Battery With Respect to Count 6*

In count 6, Jackson was charged and convicted of battery causing serious bodily injury to Destiny in violation of section 243, subdivision (d). He asserts the superior court prejudicially erred by not instructing the jury on the lesser included offense of simple/misdemeanor battery in violation of section 242. We disagree.

A crime constitutes a lesser included offense if it satisfies either the elements test or the accusatory pleading test. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.) A crime satisfies the elements test if all the elements of the lesser offense are also elements of the greater offense. (*Id.* at p. 1227.) A crime satisfies the accusatory pleading test if the facts alleged in support of the greater offense include all the elements of the lesser offense. (*Id.* at p. 1228.)

---

4    While the appeal was pending, Jackson identified the recently filed California Supreme Court opinion, *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), as relevant new authority. In *Scoggins*, the Court noted the opinions in *Banks* and *Clark* clarified the meaning of the special circumstances statute, after Scoggins's conviction became final, and ultimately concluded Scoggins did not exhibit reckless indifference to human life in light of those clarifications. (*Scoggins*, at p. 676.) Here, we have considered both *Banks* and *Clark* in concluding there was substantial evidence Jackson did act with reckless indifference to human life. Unlike Scoggins, who was not present for much of the underlying crime, Jackson was present for, and likely participated in, the assaults, and failed to intervene or render aid, despite the absence of other bystanders capable of doing so. (Cf. *Scoggins*, at pp. 678-680.)

As relevant here, section 242 defines battery as "any willful and unlawful use of force or violence upon the person of another."  Section 243, subdivision (a) states, "a battery is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment."  Section 243, subdivision (d) further states, "When a battery is committed against any person and serious bodily injury is inflicted on the person, the battery is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years." (§ 243, subd. (d).)  Finally, subdivision (f)(4) of section 243 defines "serious bodily injury" as, "a serious impairment of physical condition, including, but not limited to, the following:  loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement."

Jackson acknowledges that there is no authority indicating that battery pursuant to section 242 is a lesser included offense of battery causing serious bodily injury pursuant to section 243, subdivision (d).  The People agree that "it appears that simple battery is a lesser-included offense of battery with serious bodily injury under the elements test."  We need not, and expressly do not, decide the issue in this case.  Assuming without deciding that simple battery is a lesser included offense of battery causing serious bodily injury, there was insufficient evidence to support the instruction in this case and, in any event, Jackson suffered no prejudice as a result of the omission.

A. *There Was Not Substantial Evidence to Support an Instruction on Simple Battery*

The superior court has a sua sponte duty to instruct on lesser included offenses that are supported by substantial evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)  The court "is not obligated to

instruct on theories that have no evidentiary support." (*Ibid*.) " 'Substantial evidence' in this context is ' " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " ' that the lesser offense, but not the greater, was committed." (*Ibid*.) On appeal, we apply a de novo standard of review and independently determine whether an instruction on a lesser included offense should have been given. (*Ibid*.) However, we do not weigh the evidence or evaluate the credibility of witnesses, as that is the purview of the jury. (*Ibid*.; *People v. Elize* (1999) 71 Cal.App.4th 605, 615; *People v. Manriquez* (2005) 37 Cal.4th 547, 584.) We simply determine whether there was evidence " 'substantial enough to merit consideration' by the jury" that the defendant is guilty only of the lesser offense. (*Breverman*, at p. 162.)

Here, the uncontroverted evidence indicated Destiny suffered serious bodily injury. Destiny testified that she was knocked unconscious by the blow to her face, and that she suffered from chronic headaches for approximately two months after the assault. Neither Jackson, nor any other party, offered any evidence to contradict Destiny's testimony.

Jackson concedes this evidence constituted legally sufficient evidence of serious bodily injury but argues the jury may still have found him guilty of the lesser included offense of simple battery, if properly instructed, because Destiny's injuries were not permanent. In support of his assertion, Jackson cites a number of cases in which the defendant hit or punched the victim and the court found a conviction or instruction on simple battery or assault appropriate; however, none of these cases involved a loss of consciousness or ongoing injuries akin to the chronic headaches Destiny suffered. (See *People v. Fuentes* (1946) 74 Cal.App.2d 737, 740-742 [victim sustained a single cut that did not require stiches]; *People v. Brown* (2016) 245 Cal.App.4th 140, 146 [defendant swung at officers in an alleged effort to resist arrest but the

officers sustained no injuries as a result]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1306-1307 [victim sustained "a big lump" on her head but no evidence of losing consciousness]; *People v. Roth* (1964) 228 Cal.App.2d 522, 530 (*Roth*) [victim sustained a cut mouth and some bruises].) Moreover, in *Roth*, the court specifically noted that the victim "suffered no bodily injury other than a cut mouth and some bruises" and stated that an instruction on the lesser included offense of simple assault was particularly appropriate because of *the absence of serious injuries*. (*Roth*, at p. 530.) Accordingly, none of these cases suggest that a loss of consciousness does not constitute a serious bodily injury.

Jackson also relies on *People v. Taylor* (2004) 118 Cal.App.4th 11, in which the victim suffered a "small crack" in the bone around her eye. (*Id.* at p. 17.) In a footnote, and in the context of discussing whether the jury's finding of serious bodily injury could be deemed equivalent to a finding of great bodily injury, the court concluded, "not every bone fracture constitutes serious or great bodily injury as a matter of law." (*Id.* at p. 25, fn. 4.) The court noted that bone fractures are listed as one example of a "serious impairment of physical condition" in section 243, subdivision (f)(4) but explained the injuries enumerated in the statute were simply examples of injuries that *could be* serious bodily injuries if they resulted in "a serious impairment of physical condition." (*Ibid.*) Unlike bone fractures, though, which may vary significantly in severity, a loss of consciousness either occurs or does not. Moreover, the uncontroverted evidence here indicated Destiny was fully unconscious for a significant period of time, nearly the entire time the assailants were in the home, and then only regained consciousness slowly.

23

B.  *Jackson Suffered No Prejudice*

Even if we were to conclude, which we do not, that the superior court erred by failing to instruct on the lesser included offense of simple assault, Jackson suffered no prejudice as a result.  An error in failing to instruct on a lesser included offense in a noncapital case is subject to review under the prejudice standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Gonzalez* (2018) 5 Cal.5th 186, 202; *People v. Beltran* (2013) 56 Cal.4th 935, 955.)  Under that standard, the failure to instruct requires reversal only if there is a reasonable probability based on the overall record that the jury would have found the defendant guilty of the lesser offense had they been appropriately instructed.  (See *Watson*, at p. 836; *Gonzalez*, at p. 202.)

Here, as discussed, the uncontroverted evidence clearly established Destiny suffered a serious bodily injury.  (See *People v. Ochoa* (2001) 26 Cal.4th 398, 456 [omission of instruction is not prejudicial in the absence of evidence supporting the instruction].)  The court instructed the jury on the meaning of "serious bodily injury," consistent with the definition set forth in section 243 and, in convicting Jackson, the jury necessarily concluded Destiny suffered serious bodily injury.  (See § 243, subd. (f)(4).)  Defense counsel argued at length that the evidence was insufficient to positively identify Jackson as the individual who hit Destiny but, not surprisingly given the evidence, defense counsel did not even suggest that Destiny did not suffer serious bodily injury, despite the fact that the instructions to the jury clearly indicated that they could not convict Jackson unless she did actually suffer a serious bodily injury.

Jackson asserts the jury may have been compelled to offer him leniency on the assault charge, if given the option, based on the overall severity of the

24

charges but, of course, to do so would be improper. (See *People v. Williams* (2001) 25 Cal.4th 441, 459 [a jury may not disregard the law and reach a verdict based on personal views or beliefs].)

Based on the foregoing, we conclude the superior court did not err in failing to instruct the jury on the lesser included offense of simple battery, and, even if it did, Jackson was not prejudiced by the omission.

III.

*The Abstract of Judgment Must be Amended to Reflect a Stayed Middle Term of Four Years on Count 2*

The People charged, and the jury convicted Jackson, on count 2 pursuant to section 213, subdivision (a)(1)(B). In discussing the sentence for count 2, the court stated, "the potential terms that the [c]ourt could impose would be the lower, middle or upper, and that's three, six, or nine years. I'm choosing the middle term given the facts and circumstances of the case, but I'm staying it under 654." Consistent with that statement, the abstract of judgment reflects a stayed term of six years for count 2. However, the middle term for residential robbery pursuant to section 213, subdivision (a)(1)(B) is actually four years, as opposed to six. (See § 213, subd. (a)(1)(B).)

Jackson asserts, and the People concede that the abstract of judgment must be amended to reflect a four-year stayed sentence for count 2. We agree, and therefore modify the judgment accordingly. (See *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 482-484; *In re Sheena K.* (2007) 40 Cal.4th 875, 886 [it is appropriate to correct an unauthorized sentence at any time].)

## DISPOSITION

The judgment is modified to reflect a four-year sentence, stayed pursuant to section 654, on count 2 for Jackson.  The superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


GUERRERO, J.